No. 127,168

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STATE OF KANSAS,
*Appellee*,

v.

LEE ANDREW MITCHELL-PENNINGTON,
*Appellant*.

SYLLABUS BY THE COURT

1.

Where a party raises an issue for the first time on appeal and the appellate record contains the undisputed necessary facts, such as the challenged warrant applications, relevant testimony, and other information to support the district court's reasoned explanations for its decision to deny a suppression motion, the appellate court can examine the question of proper application of the good-faith exception to the exclusionary rule as an outcome-determinative question of law.

2.

Evidence obtained by law enforcement through a geofence warrant and subsequent Google warrants seeking location history data from mobile devices fell within the scope of the good-faith exception to the Fourth Amendment warrant requirement despite defendant's argument that there was no evidence that the suspect used a cellphone or other electronic device during the crime. The fact that today, most people own cellphones and carry cellphones on their person at all times, provides the necessary indicia of probable cause in the warrant application affidavit such that it was reasonable for law enforcement to believe the warrant was valid. Combined with other evidence gained prior to the warrant application, the fact that detectives were utilizing cutting-edge

1

investigative techniques with no applicable court precedent to guide them, and there was no indication of bad faith, it was appropriate for the district court to admit the evidence gained through the good-faith exception.

Appeal from Douglas District Court; AMY J. HANLEY, judge. Submitted without oral argument. Opinion filed January 23, 2026. Affirmed.

*Jacob Nowak*, of Kansas Appellate Defender Office, for appellant, and *Lee Andrew Mitchell-Pennington*, appellant pro se.

*Jon Simpson*, senior assistant district attorney, *Dakota Loomis*, district attorney, and *Kris W. Kobach*, attorney general, for appellee.

Before MALONE, P.J., COBLE, J., and SEAN M.A. HATFIELD, District Judge, assigned.

COBLE, J.: After a break-in and assault at a college students' residence, Lee Andrew Mitchell-Pennington was charged with multiple crimes and later convicted by a jury of aggravated burglary, aggravated assault, and stalking. On appeal, Pennington argues that multiple trial errors, either individually or when considered together, deprived him of a fair trial and this court should reverse his convictions. Finding none of Pennington's claims resulted in reversible error, we affirm his convictions.

## FACTUAL AND PROCEDURAL BACKGROUND

*A Break-in and Attack*

On October 29, 2021, a college student, Susan, (all students are referenced using pseudonyms) spent an evening at a series of parties with her friends in Lawrence, Kansas, beginning the partying around 8 p.m. and finishing their night in the early hours of the morning. Around 3:30 a.m., Susan and her roommate, Claire, walked from their final

party destination to their home—a relatively short distance which amounted to a 5- to 10-minute walk. Susan retired to bed after 4 a.m. to her second-floor bedroom.

Not long after she fell asleep, Susan woke to her bedroom door opening and an average-sized man in a hoodie and a COVID mask standing in her room. The man, whom she did not recognize, approached her bed, said, "[H]i" and murmured some "weird words about . . . wanting to do what he did last time." Without invitation, the man leaned over Susan, pressed his hand over her mouth, and held her down with that hand for about 30 seconds to a minute. She recalled screaming into the man's hand and being extremely afraid that he might kill or sexually assault her. The man then ran from the room, at which point Susan went to close her door and saw the man turn the corner as he ran down the stairs. Susan later testified that the man could have exited the house from any of the doors or windows, though she had closed her door and did not see his exit.

Susan immediately called the police, noting the time was about 5:11 a.m. All of Susan's roommates were still asleep when she was attacked.

*An Investigation Ensues*

Law enforcement responded to the call. The other five people in the house, including one roommate who had walked past Susan's room to get water around the time of the incident, told the police they were asleep during this time and did not hear or see anything unusual.

The investigation uncovered several suspicious signs of possible entry outside a main floor living room window, which was slightly opened. The window's exterior screen had been removed and placed on the ground, which the home's occupants deemed abnormal. Two lawn chairs, which were normally in front of the house, were stacked directly in front of the window with muddy footprints on them. Just inside the window, a

3

plant that was normally untouched had been moved. The blinds on that window were also raised, exposing the open window.

Two days later, a crime scene technician examined the scene. While she found no usable fingerprints, she identified a fingerprint ridge detail on the interior windowsill of the open window and took a DNA swab from the same location.

Detectives began to investigate the surrounding area and collected surveillance footage from cameras located in various homes and businesses around the house, as well as from the college. Based on the timeline provided by Susan and Claire, police compiled 25 video clips that tracked a potential suspect's movements.

Video footage showed that around 3:45 a.m., as Susan and Claire walked home, a dark-colored car drove past them, reversed, and pulled into a nearby driveway. The same car returned and then pulled into a nearby alleyway. A man exited the car, ran across the street, and followed the women down an alley toward their house. The footage showed the man appearing in and out of the camera, loitering near their house for several minutes. Around 4:05 a.m., the man walked back down the alleyway, crossed the street, returned to his car, and drove away.

The dark car was again spotted in the area around 4:48 a.m. It drove through the alleyway leading to Susan's home and turned left at the end of the alleyway beyond the view of the surveillance camera but with its headlights still illuminated. Moments later, the headlights turned off and a man approached the rear of the house and disappeared from the camera angle. Around 5:10 a.m., a man was seen exiting the house from the rear, running towards the area of the parked car. Soon after, headlights appeared, and the dark-colored car drove away using the same route from which it arrived.

4

From their review of the footage, and given the vehicle's identifying features, detectives determined the vehicle was a black Acura RL. After a physical search of the area, Detective Joshua Leitner located the only matching vehicle parked outside an apartment building. The car's temporary tag was registered to Pennington at that apartment building address.

Given the officers' inability to confirm that this vehicle was the vehicle shown in the surveillance videos, Detective Leitner served three warrants on Google to obtain location history data for all Google location data sources (including cellular, WiFi, Bluetooth, and GPS data) that would have been found within the investigation area during the timeframe of the crime. The data retrieved from the first and second warrants showed that a cellular device connected to Pennington was the only one that tracked the same path as the vehicle and suspect in the surveillance footage at the same times. A subsequent warrant executed at Pennington's apartment confirmed he possessed that device. A few months later, the Kansas Bureau of Investigation lab confirmed that the DNA from the windowsill was a match to Pennington.

*Pennington is Charged and Tried*

The State charged Pennington with one count of aggravated burglary, one count of aggravated sexual battery, one count of aggravated assault, and stalking. The court granted Pennington's motion for acquittal on the sexual battery charge after the presentation of evidence, finding there was insufficient evidence to find that the act of touching was done with the intent to arouse.

At trial, Pennington testified in his own defense. He denied knowing Susan or ever entering her home. He acknowledged that his DNA was on the windowsill and that he was driving his car while carrying his cellphone in the area that night. He explained his presence by stating he was working for delivery services like DoorDash and dealing

drugs to someone at a nearby address, claiming it was "just a misunderstanding." He hypothesized his DNA could have been inadvertently transferred to the scene.

After deliberating over two days, the jury found Pennington guilty of aggravated burglary, aggravated assault, and stalking. The district court sentenced him to a controlling term of 162 months in prison.

Pennington timely appeals his convictions.

### THE DISTRICT COURT DID NOT ERR BY NOT PROVIDING THE LESSER INCLUDED OFFENSE INSTRUCTION

During trial, Pennington requested a jury instruction for the lesser included offense of attempted aggravated burglary. The district court declined to give the requested instruction. Pennington now argues that the district court erred by finding that his requested jury instruction for the lesser included offense was factually inappropriate. At trial, the district judge reasoned:

> "I don't believe the facts support it. The fact that he's at the window is not an overt act in the commission of a crime standing alone. If there were other facts: He had some tools with him for breaking in, or something like that, perhaps it would support it, but the fact is he's—and again, I say the fact that he's at the window only because that was the argument. I don't . . . I'm not commenting on whether the evidence even shows that, and of course, that's not the defense theory, but let's assume for a moment that the fact is that he's at the window, that would not be an overt act in furtherance or in the commission of the crime, that in and of itself, and that's all we've got.
>
> "I'm going to decline to give attempted aggravated burglary as a lesser."

6

*Applicable Legal Standards*

"Whether a crime is a lesser included offense of another crime is a question of statutory interpretation subject to unlimited review." *State v. Toothman*, 310 Kan. 542, 552, 448 P.3d 1039 (2019). When the failure to give a lesser included offense instruction is challenged on appeal, appellate courts apply the analytical framework for jury instruction issues. *State v. Bentley*, 317 Kan. 222, 242, 526 P.3d 1060 (2023). Appellate courts follow a multi-step process when reviewing challenges to jury instructions:

> "First, the court considers the reviewability of the issue from both jurisdiction and preservation viewpoints, exercising an unlimited standard of review; next, the court applies an unlimited review to determine whether the instruction was legally appropriate; then, the court determines whether there was sufficient evidence, viewed in the light most favorable to the defendant or the requesting party, that would have supported the instruction; and, finally, if the district court erred, the appellate court must determine whether the error was harmless, utilizing the test and degree of certainty set forth in *State v. Ward*, 292 Kan. 541, 565, 256 P.3d 801 (2011). [Citation omitted.]" *Bentley*, 317 Kan. at 242.

*The Lesser Included Instruction Was Preserved and Legally Appropriate*

At the outset, the parties agree that this issue was properly preserved for appeal because defense counsel requested the disputed instruction at trial. The parties also agree that the lesser included offense instruction was legally appropriate, as attempted aggravated burglary is undoubtedly a lesser included offense of aggravated burglary. See K.S.A. 21-5109(b)(3) (a lesser included crime is an attempt to commit the crime charged); *State v. Phillips*, 312 Kan. 643, 668, 479 P.3d 176 (2021) ("In general, a jury instruction on a lesser included offense is legally appropriate.").

*The Lesser Included Offense Instruction Was Not Factually Appropriate*

Even though the lesser included offense instruction was legally appropriate, we must also consider whether the instruction was factually appropriate using an unlimited standard of review of the entire record. *State v. Holley*, 313 Kan. 249, 254, 485 P.3d 614 (2021). To decide whether the instruction was factually appropriate, we determine whether there was sufficient evidence, viewed in the light most favorable to the requesting party, which would have supported the instruction. 313 Kan. at 255. That is, the lesser included offense instruction is factually appropriate if the court would uphold a conviction for the lesser offense in the face of a challenge to the sufficiency of the evidence. *State v. Martinez*, 317 Kan. 151, 171, 527 P.3d 531 (2023).

Pennington was found guilty of aggravated burglary, defined as "without authority, entering into or remaining within any . . . [d]welling in which there is a human being, with intent to commit a felony, theft, . . . or sexually motivated crime therein." K.S.A. 21-5807(b)(1)(A). "An attempt is an overt act toward the perpetration of a crime done by a person who intends to commit such crime but fails in the perpetration thereof or is prevented or intercepted in executing such crime." K.S.A. 21-5301(a). Reading these statutes together, to uphold a conviction for attempted aggravated burglary, there must be sufficient evidence to find that Pennington performed an overt act with the intent to commit each material element of aggravated burglary but either failed in, or abandoned, his attempt to commit the crime. *State v. Larsen*, 317 Kan. 552, 557-58, 553 P.3d 302 (2023).

Pennington first claims the district court legally erred by finding that walking up to the window would not be sufficient evidence of an overt act toward aggravated burglary. The State agrees that the district court's reasoning was erroneous; however, it argues that the court was correct for the wrong reason, and the distinction is irrelevant because an aggravated burglary was completed and no rational factfinder could find that

Pennington merely attempted but failed to enter Susan's home. Both parties point to our Supreme Court's holding in *Larsen*.

In *Larsen*, the Kansas Supreme Court—when considering whether there was sufficient evidence of an overt act—found that "evidence of Larsen peeking into the window was a step toward the completed crime analogous to similar actions this court has found to be an overt act" toward the crime of aggravated burglary. 317 Kan. at 564. There the court considered a conviction of attempted aggravated burglary and examined whether the act of looking into the window was mere preparation to commit a crime or an overt act toward the commission of the crime. 317 Kan. at 563. So, then, the court's findings in *Larsen* suggest the district court here erred in finding that being at the window could not, alone, constitute an overt act toward attempted aggravated burglary.

Even so, we find *Larsen* relatively unpersuasive, as the circumstances before the court there do not reflect the situation in which we find ourselves. Here, we are determining whether the evidence supports an overt act toward commission of the crime or whether the crime was actually completed.

Pennington's defense at trial was simply that it was not him who was at the window or who entered the house. Now, on appeal, he argues that there was other evidence that could support the lesser included offense of attempted aggravated burglary, so the court erred by deciding the presence at the window was the "only" evidence of an overt act. He points to the stacked lawn chairs outside the window, the removal of the outer screen, and that the window was opened approximately 8 inches wide.

But Pennington's efforts to cast these pieces of evidence as support for an *attempted* crime is misguided. Instead, this additional evidence demonstrates that the intruder did not fail in, or abandon, his effort to commit aggravated burglary—the crime was *completed*.

The evidence presented at trial showed that a man in a dark-colored Acura RL followed Susan and Claire to their home, left, and then returned again about an hour later, when Susan's attack occurred. Immediately afterward, the home's main floor living room window was found to be partially opened and the window blinds were raised. Pennington contests this fact in his appellate brief but fails to disprove a roommate's testimony that she found the blinds open when she came down the stairs. The window's exterior screen had also been removed and placed on the ground, and the two lawn chairs were stacked directly in front of the window with muddy footprints on them.

Applying these facts to *Larsen*'s reasoning, Pennington claims this evidence provided the district court support to find that the would-be intruder took more steps in furtherance of committing aggravated burglary than merely standing at the window. While this may be true, these circumstances directly undermine Pennington's argument, because the evidence shows the intruder succeeded in entering the dwelling—even if with just a hand—and completed the aggravated burglary. The evidence left the jury with just two options—to find either that Pennington entered the home and committed aggravated burglary, or he did not.

Aggravated burglary is complete once an unauthorized entry occurs. *State v. Daws*, 303 Kan. 785, 793, 368 P.3d 1074 (2016). Our Supreme Court has held that entry is satisfied when the plane of the building's exterior wall is crossed. 303 Kan. at 789. In a prosecution for aggravated burglary, evidence of tampering with space between the outer storm window and the inner window has been found sufficient to establish that an entry of the residence was completed to constitute the crime of aggravated burglary. *State v. Crease*, 230 Kan. 541, 542, 638 P.2d 939 (1982). Also, our court has held that both removal of a screen door from a kitchen window and opening the screen door from the porch into the kitchen door were enough to constitute an entry for purposes of burglary. *State v. Carter*, 35 Kan. App. 2d 327, 331, 130 P.3d 135 (2006).

Pennington argues that the *Carter* court only determined whether a locked screened porch constitutes a building for the purpose of a burglary and is clearly distinguishable from the present case. But our court in *Carter* considered two actions taken by the intruders—entering the locked screen porch and removing the screen from a kitchen window—and specifically held that either one of those actions would constitute an entry for the purpose of burglary. 35 Kan. App. 2d at 331. The *Carter* court held that under either situation, the crime of aggravated burglary was completed, and an instruction for attempted aggravated burglary was unsupported by the evidence. 35 Kan. App. 2d at 331.

Here, the evidence demonstrated that the element of unauthorized entry was satisfied when the outer screen was removed from the window, when the window was opened, or when the blinds inside the window were raised. At any of these points, the crime of aggravated burglary had been completed. So, even if there were evidence of overt acts taken by the intruder toward an aggravated burglary—such as following the women to their home and later returning to the house after scouting the area—these overt acts were superseded by the breaking of the plane of the home's exterior wall, and consideration of mere attempt became immaterial.

Pennington claims that the evidence does not exclude his theory of guilt on attempted aggravated burglary, challenging the authenticity of the DNA evidence and arguing that the scene was compromised by the police officers' touch contamination and the house was left unsupervised for more than a day between the incident and the crime scene technician's examination. Alternatively, he claims the DNA could have been deposited by sneezing on the window or dripped saliva due to heavy breathing after scaling up to the window. Pennington also asserts that the evidence of an intruder entering the home was inconclusive, citing the height of the window, the narrow opening of the window, the obstacles in front of the window inside the home, the two dogs present in the house, and the roommate who was awake at the time of the incident. According to

Pennington, the would-be intruder who intended to enter the home would have had to abandon their plan due to logistical difficulty. But these arguments ask us to reweigh the evidence, a task left to the jury and one we are not permitted to undertake. *State v. Mendez*, 319 Kan. 718, 723, 559 P.3d 792 (2024).

Finally, in his pro se supplemental brief, Pennington claims the district court's decision was erroneous because whether an overt act, and thus an attempt, occurred was for the jury to decide so the lesser included instruction should have been provided. But the district court only has the duty to provide jury instructions for a lesser included offense if the evidence would reasonably justify a conviction for that lesser crime. K.S.A. 22-3414(3); see *State v. Armstrong*, 299 Kan. 405, 432, 324 P.3d 1052 (2014) (a district court does not err in refusing to give lesser included offense instructions on a crime which is unsupported by evidence); *State v. Williams*, 268 Kan. 1, 15, 988 P.2d 722 (1999) (a lesser included offense instruction is factually appropriate provided the evidence does not exclude a theory of guilt on the lesser offense).

As explained above, even when viewing the record in the light most favorable to Pennington, because the facts supported a completed aggravated burglary, the district court was not required to provide a lesser included instruction for attempted aggravated burglary. The district court correctly found—even if for the wrong reason—that the lesser included instruction was factually inappropriate. See *State v. Overman*, 301 Kan. 704, 712, 348 P.3d 516 (2015) (If a district court reaches the correct result, its decision will be upheld even though it relied on the wrong ground or assigned erroneous reasons for its decision.). Pennington's first instruction argument is unavailing.

12

THE DISTRICT COURT DID NOT ERR BY DENYING
the MOTION TO SUPPRESS EVIDENCE

Pennington next argues that the district court erred by denying his motion to suppress the State's evidence resulting from the Google warrants. He claims that the district court specifically erred by raising and applying the good-faith exception when the State failed to assert the exception.

*Additional Background*

As noted above, Detective Leitner obtained three warrants to gather electronic data from Google.

The first warrant was a "geofence" warrant, targeted to gather anonymized location history data from "all Google location data sources (including cellular, WiFi, Bluetooth, and GPS data)" for devices found within two geofence locations—geographic "boxes"—specified by latitude and longitude coordinates, encompassing Susan's home and the alley behind, during four overlapping time periods which roughly spanned about one hour. These locations and timeframes were those surrounding the burglary and were supported by Detective Leitner's affidavit outlining, both by written description and with pictures, the movement of the suspect and suspect's vehicle based on the obtained surveillance videos. The district court granted the warrant application. From this first warrant, Detective Leitner received from Google a spreadsheet of data showing 23 unique anonymous devices found within the specified areas and timeframes. Using this data, Detective Leitner was able to plot only one device that matched the movement pattern of the suspect vehicle as discerned from the surveillance videos.

Detective Leitner then applied for and obtained a second Google search warrant from the same judge who authorized the first warrant. This second warrant sought to deanonymize the data related to the one suspect device, and sought 60 days of device

location history leading up to the burglary; information about the make and model of the device; the address and cellphone number of the device holder; and the identity of any Gmail account "ever accessed by this device including the content of those accounts such as messages sent or received, Google Wallet information, IP Connection logs and any subscriber information" for the six months preceding the crime. Detective Leitner received specific information about the device, including Gmail and Google Wallet accounts, which listed Pennington as the account holder, his address, and a list of Google services running on that account. Google did not provide the location data sought in response to the second warrant.

From this information, Detective Leitner applied for and obtained a third warrant to Google, approved by a different district judge. This warrant sought all information relating to the Google account associated with the confirmed Gmail address, including subscriber information, device-specific information like make and model, and location history resulting from use of multiple Google applications for a 16-day period—from 8 days immediately prior to the burglary to 8 days after the crime. Detective Leitner testified this was to confirm Pennington's possession over the device in location and temporal proximity to the burglary and reveal any possible connection between the attacker and victim, particularly given that Susan did not know her attacker, but the attacker made the comment to Susan about an earlier encounter. In response to this warrant, Google provided the serial number of the device and produced the requested 16 days of location data for the device.

A fourth search warrant was then sought and issued for Pennington's home and physical cellphone for "[a]ll data" in a five-day period. Pennington raises no issues on appeal regarding this warrant but focuses on the three Google warrants.

Before trial, Pennington filed a motion to suppress all evidence obtained from the three Google warrants. He argued that all three affidavits were not sufficiently supported

14

by probable cause and lacked particularity. He also asserted that the second and third warrants were overbroad and that, because of the invalidity of the first geofence warrant, the subsequent evidence gained from the other warrants was also inadmissible as fruit of the poisonous tree.

The district court found that the first warrant was legally deficient because it lacked probable cause. The court explained that the affidavit supporting the geofence warrant "fail[ed] to articulate why [law enforcement] believed a cell phone would be used or possessed by this particular perpetrator for this particular crime." The district court then found the "second and third warrants [were] overbroad and not narrowly tailored to the purpose of establishing identity." In addition to the issues with the second and third warrants, because the first warrant was deficient, and the second and third warrants were obtained using information from the first warrant, the district court also found that all evidence derived from the second and third warrants was barred as fruit of the poisonous tree.

Despite these legal deficiencies, the district court denied Pennington's motion to suppress the resulting evidence by sua sponte applying the good-faith exception to the exclusionary rule, established by *United States vs. Leon*, 468 U.S. 897, 900, 104 S. Ct. 3405, 82 L. Ed. 2d 677 (1984), an argument the State had not raised. The district court found that "[t]he use of the Geofencing technique is still new and its legality is unclear" such that reliance on the warrant was not unreasonable. Finding Detective Leitner "relied on his training and past experience seeking Geofence warrants" along with approval of the warrants by two different judges, the court could not find that the officer's reliance on the "contested warrants was objectively unreasonable or that suppression of this evidence would produce deterrent benefits" as would serve the underlying purpose of the exclusionary rule. Finding no other circumstances existed which supported exclusion, the district court denied Pennington's suppression motion.

15

Throughout the trial process—pretrial, during trial, and in his posttrial motions—Pennington repeatedly objected to the district court's application of the good-faith exception on the basis that the State never argued the exception. The district court noted the objections for the record but consistently held that it had properly applied the good-faith doctrine in accordance with the law.

*Standard of Review*

On a motion to suppress, an appellate court generally reviews the district court's findings of fact to determine whether they are supported by substantial competent evidence and reviews the ultimate legal conclusion de novo. *State v. Garrett*, 319 Kan. 465, 469, 555 P.3d 1116 (2024). But when the material facts supporting a district court's decision on a motion to suppress evidence are not in dispute, the ultimate question of whether to suppress is a question of law over which an appellate court has unlimited review. *Mendez*, 319 Kan. at 735-36.

*The District Court's Application of the Good-Faith Exception*

Pennington argues that the district court committed reversible error by sua sponte raising the good-faith exception. The core of his argument is that the trial judge abandoned the required role of a "'fair, unbiased and impartial'" arbiter and instead took part in advocating for the prosecution's shortfall. Pennington claims that when a court constructs an argument on behalf of a litigant—as he claims it did here—it crosses a "sacrosanct" line and compromises the adversarial system.

The State counters that the district court acted properly, and even if the court erred, any error was harmless. The State argues that the district court had the discretion, and even a duty, to apply the relevant law, which includes the good-faith exception. When a defendant moves to suppress, the State suggests it necessarily raises the question

16

of whether a suppression remedy applies. And the policy underlying the exclusionary rule—deterrence of future Fourth Amendment violations, not the redress of past injury—supports the district court's discretion to raise the good-faith exception.

To his point, Pennington bases his argument that a district court is precluded from raising non-jurisdictional issues sua sponte on our court's rationale in *State v. Larkin*, No. 115,985, 2017 WL 6395789 (Kan. App. 2017) (unpublished opinion). There, a panel of our court acknowledged the "basic rule" that a district court errs by sua sponte raising a nonjurisdictional issue. 2017 WL 6395789, at *4 (citing *Frontier Ditch Co. v. Chief Engineer of Div. of Water Resources*, 237 Kan. 857, 864, 704 P.2d 12 [1985], and *Huffmier v. Hamilton*, 30 Kan. App. 2d 1163, 1166, 57 P.3d 819 [2002]).

The State makes compelling arguments about the conclusory analysis in *Frontier Ditch* and how its pronouncement is not necessarily congruent with other maxims in Kansas law. See, e.g., *State v. Williams*, 196 Kan. 628, 635, 413 P.2d 1006 (1966) ("'A trial court does not commit error in excluding incompetent and irrelevant evidence, although no objection is made by the party against whom the evidence is attempted to be introduced.'"). Additionally, when considering the rule laid down in *Frontier Ditch*—in the context of the rule of civil procedure regarding responsive pleading—against the purposes of the exclusionary rule, which is a judicial remedy created specifically to deter future Fourth Amendment violations, the applicability of *Frontier Ditch*'s rule seems suspect in this circumstance.

Even so, we are duty bound to follow rulings of our Supreme Court unless there is some signal that the Supreme Court is departing from its previous position. *State v. Patton*, 315 Kan. 1, 16, 503 P.3d 1022 (2022). And we have no such indication. See, e.g., *ARY Jewelers, L.L.C. v. Krigel*, 277 Kan. 27, 38, 82 P.3d 460 (2003) (declining to impose a duty upon the district court to raise legal theories and arguments for a party).

17

*We Consider the Good-Faith Exception for the First Time on Appeal*

But even if we do find the district court erred, we are not precluded from addressing the applicability of the exception for the first time on appeal. Pennington claims that the State's failure to raise the good-faith exception before the district court constitutes an affirmative waiver of the issue on appeal, citing *State v. Hicks*, 282 Kan. 599, 617-18, 147 P.3d 1076 (2006). He further contends that this court is prevented from reaching the unpreserved issue by virtue of *State v. Unruh*, 320 Kan. 260, 265, 565 P.3d 825 (2025). We disagree on both accounts.

Pennington did not object to the facts on which the court based its application of the good-faith exception to the district court. His objections throughout the case focused on the district court's perceived lack of impartiality. Cf. *State v. Jones*, 306 Kan. 948, 958-59, 398 P.3d 856 (2017) (recognizing that a litigant and their counsel have the responsibility to object to inadequate findings of fact so the trial court has the opportunity to correct inadequacies, and "when there is no objection, omissions in findings are not considered on appeal"). Nor did he object to the district court's factual findings in his opening appellate brief but again focused only on the legality of the district court's application of the exception. He only belatedly tries to create a factual issue in his reply brief, but this is not permitted. See *Schutt v. Foster*, 320 Kan. 852, 858, 572 P.3d 770 (2025) (reading Supreme Court Rules 6.02[a][5] [2025 Kan. S. Ct. R. at 36] and 6.05 [2025 Kan. S. Ct. R. at 37] together and finding that appellants may not invoke preservation exceptions for the first time in the reply brief).

Given Pennington's failure to raise a factual concern, we approach this issue as a legal one. In fact, our Supreme Court has applied the good-faith exception over a defendant's objection that the district court lacked a factual basis for its application of the exception. *State v. Dennis*, 297 Kan. 229, 300 P.3d 81 (2013). In *Dennis*, our Supreme Court pointed out it was "unnecessary for the officer to specifically articulate" his legal

authority for the search "because application of a good-faith exception to the exclusionary rule is not governed by a subjective inquiry. The question is whether an objectively reasonable officer could rely on" the authority. 297 Kan. at 230.

Other panels of this court have approached application of the good-faith exception as a pure question of law when the appellant points to no disputed facts. In *Larkin*, the appellant argued that no evidence was heard at the suppression hearing and that the basis or belief for the officer's actions was not discussed at the preliminary hearing. 2017 WL 6395789, at *3. A panel of our court found that district court properly relied on evidence taken at the preliminary hearing, and the appellant did not cite any disputed facts to prevent the appellate court from deciding the issue. The court went on to also consider whether the State could raise the good-faith exception for the first time on appeal, even if the district court had erred. It concluded the State could, and because the State did raise the issue, the court found the good-faith exception applicable. 2017 WL 6395789, at *6.

Although appellate courts do not typically consider arguments raised for the first time on appeal, there are exceptions to this rule—one being whether the newly asserted theory involves only a question of law arising on proved or admitted facts. *State v. Johnson*, 309 Kan. 992, 995, 441 P.3d 1036 (2019). But even if we determine an exception to this rule applies, we must consider whether the theory is "amenable to resolution on the merits given the existing record." *Unruh*, 320 Kan. at 265.

Evidence was presented both at the preliminary hearing and at the suppression hearing, conducted before the same judge, examining the process by which the warrants were obtained. Detective Leitner testified at both hearings, and the suppression hearing included not only considerable testimony by Detective Leitner but exhibits offered by the State. Detective Leitner testified about his training in geofence warrants, why he believed a geofence warrant was applicable in this investigation, and how he based the geofence parameters on the victim's address and the information gathered from surveillance videos.

19

The detective explained how the geofence warrant led him to the information sought by the next warrant, discussing the progression through all warrants discussed in Pennington's suppression motion.

Each of the challenged warrant applications, along with Detective Leitner's testimony at the suppression hearing and trial, are present in the record before us, as are the district court's repeated explanations for its decision to deny the suppression motion. We then have no trouble examining the issue as an outcome-determinative question of law. See *State v. Bailey*, 315 Kan. 794, 798-800, 510 P.3d 1160 (2022) (reviewing previously unraised issue where the parties disputed only the legal significance of the factual record).

Likewise, we find that preservation in the context of our Supreme Court's discussions in *State v. Scheetz*, 318 Kan. 48, 541 P.3d 79 (2024), and *Unruh* were situations in which a district court was never afforded the opportunity to consider an issue because the parties did not raise it. See *Scheetz*, 318 Kan. at 54-55 (emphasizing the importance of confining a party's appellate arguments to the grounds presented to the district court so the district court may consider as fully as possible whether the evidence should be admitted); *Unruh*, 320 Kan. at 262-63 (examining a due process argument never considered by the district court where Unruh did not challenge imposition of a registration requirement at sentencing). Here, we have no such concerns because the district court did consider the issue and outlined, on multiple instances, the rationale for its decision.

Ultimately, we find *Hicks* as unhelpful to Pennington's position as it was to Larkin. In *Hicks*, our Supreme Court stated that *it would have entertained a good-faith exception argument had the State raised it on appeal*, but there, the State did not. *Hicks*, 282 Kan. at 617-18. Conversely, here, as in *Larkin*, "since the State in our case has

argued the good-faith exception on appeal, there is no obstacle to our consideration of it." 2017 WL 6395789, at *6.

In *State v. Schmidt*, 53 Kan. App. 2d 225, 233, 385 P.3d 936 (2016), our court held that "the State can invoke the good-faith exception to the exclusionary rule for the first time on appeal because the newly asserted theory involves only a question of law based on proved or admitted facts and is determinative of the case." Similarly in *State v. Kraemer*, 52 Kan. App. 2d 686, 698, 371 P.3d 954 (2016), this court held "[t]he question of whether the good-faith exception applies is a question of law, reviewed by this court independently and without any required deference to the district court." See *State v. McClellan*, No. 115,164, 2017 WL 839720, at *10-14 (Kan. App. 2017) (unpublished opinion); *State v. Steckline*, No. 112,242, 2017 WL 383343 (Kan. App. 2017) (unpublished opinion); *State v. Rincon*, No. 113,741, 2016 WL 3856670, at *3-5 (Kan. App. 2016) (unpublished opinion). Persuaded by these holdings, the *Larkin* court found that the good-faith exception should apply. 2017 WL 6395789, at *6.

We are similarly convinced. As discussed, our Supreme Court has suggested it would consider a good-faith exception argument raised for the first time on appeal, if it were properly presented. See *Hicks*, 282 Kan. at 617 ("Had the State pursued an argument regarding application of the *Leon*, 468 U.S. 897, good faith exception to the exclusionary rule, we would have entertained it on the merits."); *State v. Nece*, 303 Kan. 888, 897, 367 P.3d 1260 (2016) ("Despite [the Court of Appeals'] suggestion that the good-faith exception might apply, the State did not file a supplemental brief presenting the argument to us and at oral argument the attorney for the State conceded that the State was not seeking application of the exception. We, therefore, decline to consider the potential application of the exception to Nece's case."). And here, we recognize that the parties were presented with multiple opportunities to argue the application of the exception before the district court, despite the State's initial failure to raise the topic, because Pennington repeatedly raised the issue throughout trial. Where a party raises an

21

issue for the first time on appeal and the appellate record contains the undisputed necessary facts, such as the challenged warrant applications, relevant testimony, and other information to support the district court's reasoned explanations for its decision to deny a suppression motion, the appellate court can examine the question of proper application of the good-faith exception to the exclusionary rule as an outcome-determinative question of law.

Given the record before us, this is not a situation in which the record is devoid of the district court's consideration and rationale.

*The Good-Faith Exception Applies*

Having answered in the affirmative the question of whether we may properly consider the good-faith exception, we must then determine whether it is appropriate for us to examine the merits of that exception. The sole issue Pennington raises on appeal is whether the district court could apply the exception, and not whether it did so correctly on the merits of the exception. Yet the State goes a step further, examining the evidence presented to the district court at the suppression hearing in detail to argue the merits of the good-faith exception's application. Ultimately, it is the State's burden to demonstrate that the exception applies. K.S.A. 22-3216(2); *State v. Posa*, 61 Kan. App. 2d 250, 259, 500 P.3d 1212 (2021). We find, for the reasons to follow, that the State has met this burden.

Ordinarily, when law enforcement obtains evidence in violation of a person's constitutional rights, the exclusionary rule prevents the evidence from being utilized at trial. *State v. Hubbard*, 309 Kan. 22, 32-33, 430 P.3d 956 (2018); *State v. Pettay*, 299 Kan. 763, 768, 326 P.3d 1039 (2014). Kansas courts have consistently applied the good-faith exception to the exclusionary rule, which allows evidence obtained in reliance on a facially valid warrant or statute later deemed invalid to be admitted. *State v. Hoeck*, 284

22

Kan. 441, 463-64, 163 P.3d 252 (2007). This exception is rooted in *Leon*, 468 U.S. 897, and has been adopted by Kansas courts for both federal and state constitutional claims. To find the exclusionary rule applies, it is necessary to first determine whether a constitutional violation occurred. *Hubbard*, 309 Kan. at 32-33. In this case, however, both parties seem to assume as much, given that their arguments focus only on application of the exclusionary rule. We, then, presume the same without making any specific findings.

When law enforcement reasonably relies on legal authority, such as a warrant, even if that authority is later found to be invalid, the exclusionary rule does not bar admission of the evidence gained unless one of four exceptions applies:

> "(1) the magistrate issuing the warrant was deliberately misled by false information; (2) the magistrate wholly abandoned his or her detached or neutral role; (3) there was so little indicia of probable cause contained in the affidavit that it was entirely unreasonable for the officers to believe the warrant was valid; or (4) the warrant so lacked specificity that officers could not determine the place to be searched or the items to be seized." *Hoeck*, 284 Kan. at 464.

Pennington argued before the district court and repeated in his appellate brief—albeit not in the context of the exclusionary rule but to the validity of the warrants—that the first Google warrant Detective Leitner obtained was not narrowly tailored enough to show probable cause and particularity. He argued that the detective's affidavit citing evidence of the burglary to support the warrant did not suggest that the suspect possessed a cellphone at the time of the burglary, and that the geofence boundary drawn caused the search to disclose data from many devices that were unrelated to the crime.

As to the second and third Google warrants, Pennington argued the date ranges for information sought by warrants were overly broad, and the warrants were overly broad because their requests for "'all data,' placed no meaningful restrictions on the search" and

were otherwise inadmissible as fruit of the poisonous tree because the first warrant was invalid.

We need not consider every one of Pennington's arguments. In the context of the exclusionary rule and the good-faith exception to it, we are not considering whether the warrant applications were deficient—we have presumed as much—but whether the affidavits supporting the warrants were so lacking in probable cause, on their faces, that it was "entirely unreasonable" for law enforcement to believe the resulting warrants were valid. *Hoeck*, 284 Kan. at 464. That is, were Detective Leitner's affidavits so "'bare bones'" that any reasonably well-trained officer would have known they lacked even a "'minimal nexus between the place to be searched and the suspected criminal activity'"? *State v. Zwickl*, 306 Kan. 286, 295, 393 P.3d 621 (2017). We are mindful that "[t]he threshold to avoid the *Leon* good-faith exception is a high one." *State v. Powell*, 299 Kan. 690, 701, 325 P.3d 1162 (2014).

Primarily, we consider the argument that the warrant was unreliable because law enforcement had no information that the suspect actually carried a cellular phone or somehow used the device to aid in the aggravated burglary. The first warrant affidavit stated that "most people carry a cellular device with them at all times." The affidavits supporting the second and third warrants described the data gained from the first warrant showing the movement of only one device matching the movements of the suspect shown in the surveillance videos and stated: "Affiant believes there is probable cause this device was in the possession of the suspect when the incident occurred." In its decision, before applying good faith, the district court found such a statement, at least in the first geofence warrant, "not sufficient to establish the nexus between aggravated burglary and the location to be searched." The court criticized a lack of information showing that "anyone related to the criminal activity had a smartphone, or demonstrating any pertinent person would have been using a device that feeds into Google's location tracking technology." We disagree with this logic.

24

Perhaps had the burglary occurred several years ago, this argument would bear more weight. But courts across the country, including the United States Supreme Court, have described how cellular phones "have become an integral part of everyday life" and "many, if not most, people carry a cell phone virtually all of the time." *Tomanek v. State*, 261 Md. App. 694, 715-16, 314 A.3d 750 (2024) (citing *Riley v. California*, 573 U.S. 373, 385, 134 S. Ct. 2473, 189 L. Ed. 2d 430 [2014] [noting that "modern cell phones . . . are now such a pervasive and insistent part of daily life that the proverbial visitor from Mars might conclude they were an important feature of the human anatomy"]; *Carpenter v. United States*, 585 U.S. 296, 311, 138 S. Ct. 2206, 201 L. Ed. 2d 507 [2018] [holding that historical cell-site records presented significant privacy concerns because, in part, individuals "compulsively carry cell phones with them all the time"]). In *Riley*—decided by our United States Supreme Court over a decade ago—the Court noted that until then, "people did not typically carry" a cellphone "with them as they went about their day. Now it is the person who is *not* carrying a cell phone, with all that it contains, *who is the exception*." (Emphases added.) 573 U.S. at 395. More than 10 years ago, the Kansas federal district court acknowledged that cell phones "are usually kept on an individual's person, used relatively continuously, rarely turned off, and able to keep a comprehensive log of an individual's interactions and movements in real time." *In re Cellular Telephones*, No. 14-MJ-8017-DJW, 2014 WL 7793690, at *5 (D. Kan. 2014). See Eric Lode, *Validity of Use of Cellular Telephone or Tower to Track Prospective, Real Time, or Historical Position of Possessor of Phone Under Fourth Amendment*, 92 A.L.R. Fed. 2d 1 (2015) ("Most American adults own cell phones, and cell phone users tend to keep their cell phones close at hand and carry their cell phones with them wherever they go.").

We have no trouble determining that, given society's overall usage, and even compulsion, with cellular devices (see Trevor Wheelwright, *Cell Phone Usage Stats 2025: Americans Check Their Phones 205 Times a Day*, https://www.reviews.org/mobile/2025-cell-phone-addiction/), the affidavit established at least the "minimal nexus" required to satisfy the good-faith requirement. *Zwickl*, 306

Kan. at 295. Likewise, we may find the statement sufficient for probable cause at the outset, contrary to the district court, but we are forced to leave that conversation for another day, given the narrow issue before us.

So, finding the minimal nexus required to support probable cause under the good-faith exception, we recognize that Pennington does not argue other circumstances preventing the application of the good-faith exception. He does not suggest that the judges issuing the warrants were either deliberately misled or lacked neutrality. See *Hubbard*, 309 Kan. at 33 (outlining exceptions to application of the exclusionary rule). Nor does Pennington suggest that law enforcement could not decide, from the contours of the warrants, where to search or what items to seize. We likewise find no evidence of any of these concerns in the record.

Instead, we find that Detective Leitner's affidavits and law enforcement's reliance on all three Google warrants were based on the detective's experience and training on geofence warrants and the information gained through law enforcement's investigation, and find his reliance was reasonable. Detective Leitner tailored both the physical geofence and time frame of the initial geofence warrant to the information he obtained from the 25 surveillance videos collected by other detectives in their investigation and after locating the vehicle of the suspect in the vicinity. The second and third Google warrants were likewise based on not only the detective's experience but the data obtained from the results of the first warrant. It would be difficult to ignore that the data produced from the first warrant identified just one device that had travelled in the same locations at the same times as the suspect having been identified through the surveillance videos.

The record shows that the geofence warrants were the product of Detective Leitner's good-faith investigative work. Although we have located no Kansas caselaw, to date, discussing what constitutes good faith in the context of investigations using geofence search warrants, several federal courts have provided guidance on the criteria

which courts consider satisfies the good-faith exception. See *United State v. Smith*, 110 F.4th 817, 840 (5th Cir. 2024) (finding law enforcement's actions cannot be faulted considering the novelty of the technique and the dearth of related court precedent); *United States v. Chatrie*, 590 F. Supp. 3d 901, 941 (E.D. Va. 2022) (finding detectives' investigation objectively reasonable in light of the complex legal issue presented by newly developed technology);*United States v. Kirkendoll*, No. 1:22-CR-00361-MLG, 2024 WL 1016049, at *2-3 (N.M. 2024) (unpublished opinion) (finding geofence warrants are a novel aspect of the present legal landscape, and decisional authority from other jurisdictions has not coalesced to provide a unified approach in considering such warrants).

Evidence obtained by law enforcement through a geofence warrant and subsequent Google warrants seeking location history data from mobile devices fell within the scope of the good-faith exception to the Fourth Amendment warrant requirement despite Pennington's argument that there was no evidence that the suspect used a cellphone or other electronic device during the crime. Taking into consideration the novelty of the geofence technique, the absence of binding legal precedent, and the calculated actions of law enforcement in this case, and no assertions or evidence of bad faith on the part of law enforcement, we find it appropriate to apply the good-faith exception to the three contested warrants. While the district court may not raise the issue on its own accord, because it is an issue of law we may independently reach, we affirm the district court's decision to apply the *Leon* good-faith exception to permit admission of the Google data.

### THE DISTRICT COURT DID NOT COMMIT JUDICIAL COMMENT ERROR

Pennington argues that the district court's inquiry of jurors during trial was unnecessary, accusatory, and amounts to judicial comment error.

*Additional Background*

At some point during the lunch break on the third day of trial, three court officers notified the district judge that Pennington had shown to the jury, during trial, a folder or a piece of paper with the writing that stated: "I'm looking at 10 years," or other words to that effect. During a chambers conference with counsel, a deputy sitting behind Pennington said that he saw Pennington display a manila envelope with writing on the inside stating "I'm looking at 10 years" towards the jury on two or three occasions. The deputy stated that the writing was clearly legible from where he was sitting just two rows behind Pennington, but he could not confirm whether any of the jurors saw the writing.

Still in chambers and outside the jury's presence, the district court then asked Pennington about the "message" displayed. Pennington insisted the writing on the folder was a reminder for him that he could be serving 10 years and not a message intended for anyone else. Pennington went on to accuse the court of being biased towards him and listing all the reasons why he believed the trial was unfair. The district judge assured Pennington that she was not upset with him and apologized for phrasing the writing as a "message." The district judge rephrased the question and asked Pennington if he had anything on the table with the writing stating: "I'm looking at 10 years." Pennington confirmed that the phrase was written on legal mail in his folder. Pennington also confirmed he held the mail up when he was opening the folder to go through his papers but could not say whether the jury saw the writing.

The district court expressed concern with the writing being visible at defense counsel's table and announced that she would talk to every individual juror to ensure that the jury had not been tainted or affected by the writing. The judge explained that having such writing visible to the jury was not allowed because information about a crime's penalty is "absolutely inadmissible" at trial.

28

The district court proceeded to query each juror individually, making a record while doing so and telling jurors that the questions asked were being asked of every juror. The court asked each juror questions like, "Have you observed the defendant holding up any writing during the trial," or whether the juror was "able to see any writing on paper that the defendant has." One of the jurors responded that she could see a manila folder, in a stack of folders, that had writing on it, but she was not able to read what it said. Another juror said that he had seen Pennington hold up a paper but saw nothing on the paper. The juror clarified that it looked like Pennington was showing something to his counsel and it was not directed at the jury. Both parties' counsel were afforded the opportunity to question the jurors themselves, but neither party did so. While engaging in the inquiry, the district court also directed the courtroom deputy to ensure the jurors did not discuss the matter.

Ultimately, the court found the writing existed but concluded that most jurors had not seen it, and the one juror who saw some sort of writing was unable to make out what it said. The court directed defense counsel to have the writing removed and placed elsewhere so that it could not be shown to the jury accidentally. Neither the State nor defense counsel objected to the court's inquiry of the jury or to the district court's conclusions.

Pennington now claims the district court's questioning of the jurors was unnecessary and the manner in which the district court phrased its questions was accusatory, highlighting that he had done something wrong.

*Applicable Legal Principles*

Potentially erroneous judicial comments made before a jury—that are not jury instructions or legal rulings—are reviewed as "'judicial comment error.'" *State v. Boothby*, 310 Kan. 619, 626, 448 P.3d 416 (2019). Appellate courts apply a de novo

29

standard to the question. *State v. Blevins*, 313 Kan. 413, 423, 485 P.3d 1175 (2021). Using a two-step process, we determine: (1) whether the comment was erroneous in light of all the relevant facts and circumstances, and (2) if the comment was erroneous, whether the defendant's right to a fair trial was prejudiced. *Boothby*, 310 Kan. at 626-27.

If judicial comment error is found, we apply the constitutional harmlessness test articulated in *Chapman v. California*, 386 U.S. 18, 24, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967). The party benefitting from judicial comment error—here, the State—has the burden to prove beyond a reasonable doubt that the error complained of would not or did not affect the trial's outcome in light of the entire record. In other words, the party must show there is no reasonable possibility that the error affected the verdict. *Blevins*, 313 Kan. at 423.

Even in cases such as this, where no contemporaneous objections to the district court's comments were raised, "'[w]hen a defendant's right to a fair trial is alleged to have been violated, the judicial comments are reviewable on appeal despite the lack of a contemporaneous objection.' [Citations omitted.]" *Boothby*, 310 Kan. at 628.

*The District Court's Inquiry Was Not Erroneous*

Kansas courts have held that the statutory penalty for a crime is of no concern to the jury, given the distinction between the duty of the jury to determine guilt and the court's duty to decide the punishment. *State v. Albano*, 313 Kan. 638, 648-49, 487 P.3d 750 (2021). Authority dictates that it would have been irresponsible for the district court not to have taken any remedial action upon learning of Pennington's writing. See PIK Crim. 4th 50.080 (2015 Supp.) and PIK Crim. 4th 50.090 (2015 Supp.) (instructing jurors not to consider the disposition of the case in arriving at a verdict); see also *Blevins*, 313 Kan. at 423-24 (examining cases where the jury was informed about applicability of the death penalty during trial); *State v. Lowery*, 308 Kan. 1183, 1229-30, 427 P.3d 865

(2018) (finding the district court erred by not redacting portions of a police interview that informed the jury about the possible sentence that would be imposed if the defendant was found guilty). The district court took immediate and appropriate action to investigate and attempt to cure any fundamental error in the trial. We find the district court's inquiry was not unnecessary, as Pennington suggests.

"The trial judge is not merely a moderator, but is the governor of the trial." *State v. Hamilton*, 240 Kan. 539, 545, 731 P.2d 863 (1987). Not only should the judge "strive to have the trial conducted in an atmosphere of impartiality" but he or she should also "refrain from remarks or conduct that may injure a litigant." 240 Kan. at 545. Here, the district court properly paused the trial and first engaged in an investigation with the reporting deputies, outside the jury's presence. Only when convinced that protecting the trial from error would require further examination did the district court question each juror individually. It is true that judges should exercise caution when speaking in front of a jury because juries have a natural tendency to look to a judge for guidance. 240 Kan. at 547.

But here, the district court's manner of inquiry was not unnecessarily accusatory toward Pennington. Although Pennington may be correct in that a more impartial method may have been to ask the jurors if they had seen any writing on either party's desk, hindsight always offers clarity, and the questions phrased by the court were sufficiently neutral and reasonable. Pennington's claim that the district court's questions accused him of jury tampering and that the jurors must have interpreted the court's inquiry as accusing Pennington of malfeasance is purely speculative.

Pennington asks us to blindly accept his claim that the jury was tainted without evidence or designation to the record. We do not fill in the blanks of the record by making assumptions in favor of the moving party. *State v. Morgan*, No. 109,099, 2014 WL 5609935, at *8 (Kan. App. 2014) (unpublished opinion) (citing *Harman v. State*, No.

31

108,478, 2013 WL 3792407, at *1 [Kan. App. 2013] [unpublished opinion]). Pennington fails to show that the district court improperly accused him of wrongdoing by attempting to cure the jury's potential exposure to prohibited information.

Considering all the relevant facts and circumstances, we find that the district court's questioning of the jurors did not amount to judicial comment error. As often repeated, a defendant is entitled to a fair trial, not a perfect one. *State v. Cruz*, 297 Kan. 1048, 1075, 307 P.3d 199 (2013). We find no unfairness on these grounds.

### THE COURT PROPERLY INSTRUCTED THE JURY ON THE "COURSE OF CONDUCT" ELEMENT OF STALKING

In Pennington's supplemental pro se brief, he argues that the district court improperly "constructively amended" and erroneously broadened the charging document's "course of conduct" element through its amendment to the jury instruction for Count 3, stalking. He claims for the first time on appeal that the jury instruction added elements to the charge of stalking that were not present in the charging document, thus presenting a challenge to the jury instructions given by the district court.

In the stalking charge contained in the Second Amended Complaint, the State charged:

> "That on or about 30th day of October, 2021, in Douglas County, Kansas, one Lee Andrew Mitchell Pennington, did then and there unlawfully and recklessly engage in a *course of conduct* targeted at a specific person, to-wit: . . . which would cause a reasonable person in the circumstances of the targeted person to fear for such person's safety, or the safety of a member of such person's immediate family and the targeted person is actually placed in such fear." (Emphasis added.)

32

At trial, the jury instruction on the stalking charge told the jury the State had to prove as follows:

> "1. The defendant recklessly engaged in *conduct* targeted at [Susan] which would cause a reasonable person in the same circumstances as [Susan] to fear for her safety, and [Susan] was actually placed in fear.
> "2. *The defendant did two or more of the following acts*:
>    a. *Following, approaching, or confronting the targeted person*.
>    b. *Appearing in close proximity to, or entering the targeted person's residence where the targeted person can be found*.
>    c. *Any act of communication*.
> "3. In committing these acts, the defendant had a continuity of purpose.
> "4. These acts occurred over a period of time on the 30th day of October, 2021, in Douglas County, Kansas." (Emphases added.)

*Applicable Legal Standards*

Using the framework explained in the first issue above, we review Pennington's instruction-error claim by first asking whether any error occurred and then, if necessary, considering whether any error found requires reversal. *Bentley*, 317 Kan. at 242. The State points out that defense counsel claimed, during trial, that the State inadequately charged the crime of stalking in its complaint by not stating the acts on which it was relying to prove course of conduct, and the court overruled the objection. Then, at the instruction conference, defense counsel repeated the objection that the crime was deficiently charged and sought a unanimity instruction, which the district court included in its instructions. But now, Pennington brings an opposite claim: that the initial stalking charge was proper but the jury instruction did not conform to the charge.

Even if Pennington's objection has morphed from his counsel's trial objection, a failure to preserve an instruction issue at trial only affects our analysis at the final step and we may still consider whether an instruction error occurred. *Bentley*, 317 Kan. at 242.

33

If there was instructional error but the defendant did not object to the district court's jury instructions—or as is the case here, did not object on the same basis at trial—we apply the clear error standard required by K.S.A. 22-3414(3). Using that standard, we would decide whether we are firmly convinced that the jury would have reached a different verdict had the instruction error not occurred. 317 Kan. at 242.

*There Was No Error in the Stalking Instruction*

Pennington does not contend that the instruction was factually inappropriate but only argues it was legally inappropriate because it was broader than the charging document. Because he only challenges the legal appropriateness of the district court's instruction, we exercise unlimited review of that question. *State v. Keys*, 315 Kan. 690, 712, 510 P.3d 706 (2022). It is well-established that a "jury instruction on the elements of a crime that is broader than the complaint charging the crime is erroneous." *State v. Trautloff*, 289 Kan. 793, 802, 217 P.3d 15 (2009).

Here, the charging document listed the legal element of "course of conduct" in general terms, without specifying any particular acts which would support the stalking charge. At trial, the given instruction followed PIK Crim. 4th 54.460 and the language of K.S.A. 2021 Supp. 21-5427(f) to define what course of conduct the State was required to prove. In doing so, the jury instruction actually narrowed—not broadened—the "course of conduct" element because the instruction required the prosecution to prove that element of the crime through a specific set of facts. The given instruction did not add any "alternate statutory element," and it was "more precise," "not broader than the charged crime." *State v. McClelland*, 301 Kan. 815, 829-30, 347 P.3d 211 (2015).

In *McClelland*, the Kansas Supreme Court considered the defendant's argument that the jury instruction on felony murder was broader than the charged crime where it identified three alternate crimes—the attempted aggravated robberies of three specific

victims—that the jury could rely upon to satisfy the requirement that the victim's death occurred during the attempted commission of an inherently dangerous felony. The complaint in *McClelland* simply identified attempted aggravated robbery as the underlying felony. 301 Kan. at 828.

The court found that "the language of the complaint did not identify or imply that a specific attempted aggravated robbery was the underlying felony supporting the felony-murder charge," and so the State was "not limited to pursuing that sole theory at trial." 301 Kan. at 829-30. The court found that, "[i]f anything, the instruction on felony murder was more precise, not broader, than the charged crime" and found the instruction was "legally appropriate." 301 Kan. at 830.

We find similarly here. The instruction was narrower, not broader than the charged crime, and no jury instruction error occurred.

THE DISTRICT COURT DID NOT ERR BY DENYING PENNINGTON'S MOTION TO DISMISS

In his pro se supplemental brief, Pennington next claims that the district court erred by denying his motion to dismiss the charges of aggravated burglary and aggravated assault due to insufficient probable cause shown at the preliminary hearing. Pennington claims the evidence was insufficient to show that he was inside Susan's room or that he entered the home with a specific intent to commit a crime.

*Applicable Legal Principles*

An appellate court reviews the preliminary hearing judge's probable cause finding de novo. See *State v. Rozell*, 315 Kan. 295, 305, 508 P.3d 358 (2022); see also *State v. Washington*, 293 Kan. 732, 734, 268 P.3d 475 (2012) (stating sufficiency of preliminary

examination must be challenged by motion to dismiss and denial of such motion is reviewed de novo).

In Kansas, every person charged with a felony has a right to a preliminary examination, often called a preliminary hearing, unless the person was charged after being indicted by a grand jury. See K.S.A. 22-2902(a). At a preliminary hearing, a judge examines the evidence and determines (1) whether a crime has been committed and (2) whether there is probable cause to believe that the accused committed the crime. *Washington*, 293 Kan. at 733; see K.S.A. 22-2902(c). "'Probable cause at a preliminary examination signifies evidence sufficient to cause a person of ordinary prudence and caution to conscientiously entertain a reasonable belief of the accused's guilt.' [Citation omitted.]" *Rozell*, 315 Kan. at 305. In determining whether this standard is satisfied, the district court must draw inferences in favor of the State, and, even if the evidence is weak, the defendant should be bound over for trial if the evidence tends to establish that the offense charged was committed and that the defendant committed it. *Washington*, 293 Kan. at 734.

The sufficiency of a preliminary hearing may be challenged only by a timely motion to dismiss filed in the district court. Failure to challenge the adequacy of the preliminary hearing in this manner amounts to a waiver. See *State v. Bolze-Sann*, 302 Kan. 198, 202, 352 P.3d 511 (2015). Here, Pennington sought dismissal at the preliminary hearing and asked the court, in writing, to reconsider its probable cause finding and dismiss the aggravated burglary and aggravated assault charges, so the issue is properly presented.

*Even If There Were Error, Any Error Would Be Harmless*

Assuming for the sake of argument and without making any findings that there was error in the probable cause findings after the preliminary hearing, we can proceed

36

directly to the harmlessness analysis because Pennington's claim fails even if error occurred.

Kansas courts have consistently held that errors at the preliminary hearing stage do not automatically invalidate subsequent convictions. "As a general principle, after an accused has gone to trial and has been found guilty beyond a reasonable doubt, any error at the preliminary hearing stage is considered harmless unless it appears that the error caused prejudice at trial." *State v. Jones*, 290 Kan. 373, 381, 228 P.3d 394 (2010). Here, Pennington went to trial, and a jury convicted him of both felony aggravated burglary and aggravated assault along with misdemeanor stalking.

Although Pennington argues that the evidence provided during his preliminary hearing was insufficient to prove the "entering into" element of aggravated burglary or either felony crime's intent elements, he does not explain how anything that happened at the preliminary hearing undermined either the integrity of his trial or the jury's ultimate verdict. He does not suggest, or show, that the district court deprived him of some "essential constitutional right" by binding him over for trial. See *Jones*, 290 Kan. at 378-83 (finding that denial of defendant's right to self-representation at the preliminary hearing defied harmless-error review and warranted reversing defendant's convictions). He argues that the DNA evidence only shows he may have been present "at some point and time" but does not conclusively show his guilt. But he does not demonstrate that the evidence presented at his preliminary hearing and the evidence presented to the jury at trial were so fundamentally different that it somehow prejudiced his defense. Accordingly, we have no reason to find any error at the preliminary hearing was anything but harmless.

CUMULATIVE ERRORS DID NOT DEPRIVE PENNINGTON OF A FAIR TRIAL

In his final argument, Pennington alleges that his convictions must be reversed and his case remanded for a new trial because cumulative errors deprived him of a fair trial. Cumulative trial errors, considered together, may require reversal of the defendant's conviction when the totality of the circumstances establish that the defendant was substantially prejudiced by the errors and denied a fair trial. *State v. Hirsh*, 310 Kan. 321, 345, 446 P.3d 472 (2019). In our examination of the cumulative effect of errors during the trial, we examine the errors in context and consider how the district court dealt with the errors as they arose; the nature and number of errors and whether they are interrelated; and the overall strength of the evidence. *State v. Guebara*, 318 Kan. 458, 483, 544 P.3d 794 (2024).

As discussed above when discussing his individual claims, even if the district court erred by denying the motion to suppress, we have considered the issue and found the good-faith exception applied. The district court did not err by asking jurors about potentially being exposed to prohibited information. And because no clear error was found in either of Pennington's jury instructional error claims, we need not include them in a cumulative error analysis. *State v. Waldschmidt*, 318 Kan. 633, 634-35, 546 P.3d 716 (2024). Finally, although we assumed error at the preliminary hearing, without analyzing it, that error was found harmless given Pennington's failure to show prejudice.

Given the proper application of the good-faith exception, Pennington's failure to explain how the assumed—but harmless—error at the preliminary hearing bears any relation to the first error, and the overall strength of the evidence in this case, we conclude cumulative error does not require reversal.

Affirmed.